**Bettye Delores PITTS, et al., Plaintiffs,**

**v.**

**Edwin MEESE, III, et al., Defendants.**

**Civ. A. No. 79–1559 (JGP).**

United States District Court,
District of Columbia.

Dec. 9, 1987.

Jeffrey P. Ayres, Baltimore, Md., John E. Scheuermann, Washington, D.C., for plaintiffs.

Mark Nagle, Asst. U.S. Atty., Beverly Burke, Asst. Corp. Counsel, Washington, D.C., for defendants.

## OPINION

JOHN GARRETT PENN, District Judge.

The plaintiff Bettye Delores Pitts filed this action pursuant Due Process Clause of the Fifth Amendment to the Constitution of the United States.[1] Thereafter, the Gwendolyn A Samuels and Diane Henson were permitted to intervene as plaintiffs.[2] The plaintiffs also assert claims pursuant to 42 U.S.C. § 1983.

The plaintiffs allege that it is the policy and practice of the defendants to incarcerate plaintiffs and other women like them, who have been convicted under the District of Columbia Code and sentenced in the Superior Court of the District of Columbia (Superior Court) for periods of incarceration in excess of one year, to federal correctional institutions, while simultaneously placing similarly situated males in District of Columbia correctional institutions. Plaintiffs ask the Court to declare that policy and practice unconstitutional and an abridgement of rights secured to plaintiffs and women like them by the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution of the United States and to enjoin and restrain the defendants from unconstitutionally discriminating against the plaintiffs and other women like them on the basis of sex.[3]

The case is now before the Court on the defendants' motions to dismiss or, in the alternative, for summary judgment and the plaintiffs' motion for summary judgment.

### I

In their complaint, the plaintiffs allege that the District of Columbia does not provide prison facilities for women such as the plaintiffs who have been convicted under the District of Columbia Code and sentenced in the Superior Court to periods of incarceration in excess of one year. They

---

1. This action was originally filed in the Superior Court of the District of Columbia and was removed to this court on the motion of the then Attorney General of the United States.

2. Ms. Pitts had originally filed this action pro se, together with a request for the appointment of counsel. Counsel filed an appearance on her behalf at the request of the Court and thereafter filed an amended complaint. Subsequently, the plaintiffs Gwendolyn A. Samuels and Diane Henson moved to intervene as plaintiffs in separate motions and on different dates and those motions where granted.

3. With respect to States, an equal protection guarantee is found in the Fourteenth Amendment to the Constitution of the United States which does not apply to the federal government and the District of Columbia. The Due Process Clause of the Fifth Amendment to the Constitution, which applies to the federal government and the District of Columbia, has been interpreted to encompass an equal protection guarantee. *Bolling v. Sharpe,* 347 U.S. 497, 74 S. Ct. 693, 98 L.Ed. 884 (1954) (outlawing segregated schools in the District of Columbia).

contend that as a result, the plaintiffs and women like them cannot be incarcerated in a District of Columbia prison, and are sent to federal correctional facilities across the United States. On the other hand, males who are convicted under the District of Columbia Code and sentenced in the Superior Court are usually sent to the District of Columbia Reformatory in Lorton, Virginia (Lorton), which is within the Washington, D.C. metropolitan area.

D.C. Code Ann. § 24-402 (1981)[4] provides in part:

Whenever any person has been convicted of crime in any court in the District of Columbia and sentenced to imprisonment for more than 1 year by the court, the imprisonment during the term for which he may have been sentenced or during the residue of said term may be in some suitable jail or penitentiary or in the Reformatory of the District of Columbia; and it shall be sufficient for the court to sentence the defendant to imprisonment in the penitentiary without specifying the particular prison or the Reformatory of the District of Columbia and the imprisonment shall be in such penitentiary, jail, or the Reformatory of the District of Columbia as the Attorney General shall from time to time designate: Provided, that the Mayor of the District of Columbia is vested with jurisdiction over such male and female prisoners as may be designated by the Attorney General for confinement in the Reformatory of the District of Columbia from the time they are delivered into his custody or into the custody of his authorized Superintendent, deputy, or deputies, and until such prisoners are released or discharged under due process of law.

Moreover, D.C. Code Ann. § 24-425 (1981)[5] provides:

All prisoners convicted in the District of Columbia for any offense, including violations of municipal regulations and ordinances and acts of Congress in the nature of municipal regulations and ordinances, shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons.

It is undisputed that in the District of Columbia or in the Washington D.C. metropolitan area there are no facilities for women prisoners who have been sentenced under the District of Columbia Code to a term of imprisonment which exceeds one year. Most women falling into that category are confined at the Federal Correctional Institution in Alderson, West Virginia, and some are incarcerated in other federal facilities depending upon their individual needs. On the other hand, male prisoners falling into the same category are usually incarcerated in the Reformatory of the District of Columbia in Lorton, Virginia or in the District of Columbia facility at Occoquan, Virginia.[6]

---

**4.** Formerly D.C. Code § 24-402 (1973).

**5.** Formerly, D.C. Code § 24-425 (1973).

**6.** In the past, males were sent to federal facilities for a number of reasons, including but not limited to, to serve Federal Youth Corrections Act sentences, Narcotic Addicts Rehabilitation Act sentences, for other specialized drug treatment, for vocational rehabilitation, for psychiatric care, as well as for security reasons totally unrelated to a prisoner's cooperation with police or prosecutors. *See* Statement of Exceptions to Plaintiff[s'] Statement of Material Facts as to Which There Is No Genuine Issue, par. 5. While some of the above programs are no longer available, it is likely that District of Columbia prisoners may be sent to federal prisons for some of the above reasons.

This issue has raged throughout a number of years albeit in different forms. At one point, female prisoners made a similar claim of discrimination but their argument focused on the issue of parole. They contended that since there were no District of Columbia prison facilities for women, the women were confined in federal facilities and therefore subjected to federal parole standards, while males, falling into the same category, were confined in District of Columbia facilities and thereby the subject of the allegedly more lenient District of Columbia parole standards. This issue was purportedly resolved when the parties entered into a consent decree which provided for treating female District of Columbia offenders, apparently including United States Code violators, like the bulk of male District of Columbia offenders in District of Columbia custody.[7] *Cosgrove v. Smith,* 225 U.S.App.D.C. 235, 256, 697 F.2d 1125, 1146 (1983) (concurring and dissenting opinion by Judge Bork).

In addition, it seems clear that the District of Columbia has no intention of constructing a prison facility within the next year to house female prisoners sentenced under the District of Columbia Code to serve in excess of one year. Within the last year the Mayor and the City Council, as well as local government agencies, community leaders and citizens have engaged in many discussions over the construction of a new prison facility in the District of Columbia or the surrounding metropolitan area. While it appears likely that such a facility will be constructed, the District of Columbia, in a response to an inquiry from this Court, has advised that it does not intend to provide for female prisoners in the new facility.[8]

The plaintiffs argue that District of Columbia female prisoners are placed at a substantial disadvantage as compared to male prisoners because they are never incarcerated in the District of Columbia. As a consequence they are further away from their homes and families and that incarceration works a greater hardship upon them and their families, especially their children. Additionally, they are placed at a disadvantage because they are denied the benefits of such programs as furlough, work release, halfway house treatment, and educational study programs, which are available to male prisoners situated in the District of Columbia area.

The Court will now turn to the undisputed evidence presented in the record of this case.

## II

In testimony before a House Subcommittee, Norman A. Carlson, Director, Bureau of Prisons, stated that the Bureau "handle[s] *all female offenders sentenced in the District of Columbia,* whereas in the other parts of the country, we handle only those women sentenced for *federal crimes."* Plaintiffs' Motion Exhibit F at 25. He noted further that the Bureau permits anybody to visit, "and obviously children would be welcome with parents and husbands, to come as frequently as seven days a week, Monday through Sunday, and

7. While the consent decree in *Garnes v. Taylor,* Civil No. 159–72 (D.D.C. Dec. 10, 1976) purportedly resolved the issue of the application of different parole standards to female and male prisoners, Judge Bork in his concurring and dissenting opinion in *Cosgrove v. Smith,* 225 U.S.App.D.C. 235, 256, 697 F.2d 1125, 1146 (1983) noted:

The sex discrimination issue is unclear on factual grounds as well. For appellants to make out their claim, they must, as a first step, prove differential treatment of men and women. The record does not currently contain that showing. Indeed, there is a strong suggestion in the record that, despite the *Garnes* decree, women District offenders are

not consistently receiving parole consideration by the District board under District parole standards.

This Court understands that the issues in *Cosgrove* are still unresolved and, subsequent to the remand by the Court of Appeals, the parties undertook extensive discovery.

8. The Court notes that the District of Columbia is under court orders that limit the number of prisoners that may be maintained at Lorton and other places of confinement, and that some prisoners are being granted early release to bring the number of prisoners within the facilities down to the number provided for in court orders.

visit all day." *Id.* And, significantly, Mr. Carlson testified that:

I think that we have found that because of the very large proportion of urban inmates, that maybe the trend ought to be to get away from rural type locations and get in areas where it will be easier for the people, once they have served their time, to go back into the community with a job skill or some kind of training that may be available to them when they return, like they are apt to do, in their urban community.

Mr. Carlson's statement suggests that there is a benefit if urban inmates, such as those from the District of Columbia, are incarcerated, where possible, near their community. He noted that "[b]ecause the average female offender has two dependent children for whom she must be responsible upon release, visitation programs to strengthen family ties are of particular importance." Plaintiffs' Motion Exhibit E at 6. Since female prisoners cannot be incarcerated in the District of Columbia area, the Carlson statements suggest that they are placed at a disadvantage when compared with male prisoners from the District of Columbia.

Delbert C. Jackson, a former Director, District of Columbia Department of Corrections, submitted a paper before a House Subcommittee in which he stated that "women felons were transferred to Alderson, West Virginia and the [women's] reformatory was turned over to the Rehabilitation Center for Alcoholics (DHR) in 1967" after the *Easter* decision.[9] Plaintiffs' Motion Exhibit B at 2. Then Mr. Jackson made the follow statement as to "current" treatment and related problems of female prisoners incarcerated at Alderson, West Virginia.

Presently, the Department has no sentencing facilities for women offenders. Instead, women offenders are transferred to the Federal system and may be housed at Alderson, West Virginia, Lexington, Kentucky or as far away as Pleasanton, California. *This reduces their ability to improve and/or maintain their family and community contacts and relationships which are a positive force in aiding them to achieve a successful community re-entry and adjustment upon release.*

*The lack of a Women's Correctional Facility in the District excludes equal protection to the female offender. They are unable to participate in Department activities such as our work-training and educational furlough program, and receive regular and necessary visits from their families and friends due to the hardship and expense incurred in traveling to West Virginia (this is not the case for the District's males incarcerated at Lorton).*

*Id.* at 2–3 (emphasis the Court's).

In testimony that echoed that of Mr. Carlson and Mr. Jackson, Patricia P. Taylor, who was Assistant Director, Community Women's Programs, District of Columbia Department of Corrections testified that: "Several years ago we submitted as part of the Lorton Improvement Plan the drawings for the women's facility at Lorton. That plan has not yet become a reality, and it appears to constantly meet with heavy opposition." Plaintiffs' Motion Exhibit A at 49. She noted also that Congress had appropriated money for the Lorton Improvement Program but that the District never acted on it and "the money has now gone back." *Id.* at 54. With respect to the importance of prisoners being close to home, Ms. Taylor stated:

Oh, very important. You have to realize that at Alderson, these women are not eligible for our furlough program. They are not eligible for work training, and while we bring them back for work release when they are within six months away from their parole eligible date, their male counterparts are eligible to be in work training programs *two years prior to that.*

*Id.* at 51–52 (emphasis the Court's).

Council Member David Clarke at the Oversight Hearing before the Subcommittee on Judiciary and Education of the Committee on the District of Columbia, House

**9.** *See Easter v. District of Columbia,* 124 U.S. App.D.C. 33, 361 F.2d 50 (1966).

of Representatives testified in part as follows:

> As you are aware, the District of Columbia does not currently have a correctional facility for long-term women offenders. As a result, most of the District's women offenders are placed at the Federal correctional institution at Alderson, W.Va. The disadvantages of placement at Alderson are numerous. Problems relating to the lack of appropriate job training, educational programs and other services are apparent.
>
> However, these problems are compounded by the fact that the women who are sent to Alderson, located more than 250 miles from the District, are virtually isolated from contact with family and friends. It is recognized that such isolation has a severe impact on the rehabilitation process. *The inequity of this situation is magnified by the fact that the decision to send a woman to Alderson is made solely on the basis of sex.*

District of Columbia Female Offenders in the Federal Prison System: Oversight Hearing Before Subcomm. on House Comm. on the District of Columbia, 97th Cong., 2nd Sess. (Oversight Hearing) 4 (1982) (emphasis the Court's). Other testimony given at the hearing supported the words of Mr. Clarke.

In support of their motion, the plaintiffs also note that woman prisoners are unable to receive regular and necessary visits from the families and friends due to the distance of the facility from the District of Columbia, that the Alderson community is not served by scheduled airlines or buses and that up to 1978 only night train service was provided. Moreover, the community offers no hotels, motels or other overnight accommodations. Perhaps, most telling is the fact that family visitation, including visits by children, is very difficult, a fact recognized by the Warden at the institution. Plaintiffs note that during 1978 only fifty different inmates, which then had a population of 400, received visitors.

Another factor cited by the plaintiffs is that the Alderson community lacks work-training programs. While male prisoners incarcerated in the District of Columbia area have the possibility of work release and education programs, such programs are not available in Alderson.

## III

Before discussing the merits of the pending motions, it is important to note what is not involved in this case.

Early on in this action the plaintiffs challenged the effect of their place of incarceration on their parole status, as well as the location of their incarceration. Because of this and because of certain comments in the concurring and dissenting opinion of Judge Bork in *Cosgrove v. Smith, supra,* the Court filed a Memorandum Order in which it asked the parties to address four issues. First, the Court asked the parties to address the matter of the *Garnes v. Taylor,* Civil No. 159–72 (D.D.C.1976), consent judgment and its effect upon this litigation. Second, the Court asked the parties to address whether, recognizing that there was a consent judgment in *Garnes,* that agreement was being followed by the District of Columbia and the Federal defendants. This question was raised based upon the comment by Judge Bork in *Cosgrove* concerning whether the parties were adhering to the *Garnes* procedure. Judge Bork noted that: "Indeed, there is a strong suggestion in the record [in *Cosgrove*] that, despite the *Garnes* decree, women District offenders are not consistently receiving parole consideration by the District board under the District parole standards." *Cosgrove,* 225 U.S.App.D.C. at 256, 697 F.2d at 1146. Third, what is the effect of the decision in *Curry–Bey v. Jackson,* 422 F.Supp. 926, 931 (D.D.C.1976), *aff'd sub. nom., Morgan v. Jackson,* No. 75–2127 (D.C.Cir. Dec. 9, 1977) (mem.), on this litigation. Fourth, whether the fact that female District of Columbia offenders are incarcerated at Alderson alone raises a fundamental constitutional question assuming *arguendo* that those offenders are considered for parole by the District of Columbia Parole Board or pursuant to standards followed by that board. Memorandum Order filed January 21, 1973 at 3–5.

The Court notes that the plaintiffs contended that, notwithstanding the *Garnes* decree, women are still considered for parole pursuant to the federal standard and that the *Garnes* decree was not being followed. In response, the Federal defendants observed that Judge Bork's comments were based in part on a report by Lucy Steinitz, "The *Garnes* Decree in Reality: Parole Eligibility and Determination for D.C. Women in Federal Correctional Institutions (1981)." They note, however, that the Steinitz report was written *prior* to the Joint Agreement entered into by the parties, establishing the procedure for female District of Columbia Code violators who are within nine months of their parole eligibility date to obtain transfer to the District of Columbia Department of Corrections. The Joint Agreement was apparently designed to overcome problems encountered in implementing the *Garnes* decree.

The first and second items mentioned above are no longer involved in this litigation because the plaintiffs voluntarily dismissed the "parole claims." *See* Order filed November 7, 1983. Thus, the Court will not address the parole issues in this case but will assume that all District of Columbia Code violators are being considered for parole pursuant to the guidelines and procedures of the District of Columbia Board of Parole.

With respect to the third question posed by the Court in its January 21, 1983 Memorandum Order, that is, the effect of *Curry–Bey* on this litigation, that will be discussed when the Court addresses the sole remaining issue in this case, that is, whether the placement of female District of Columbia Code violators violates the equal protection provisions of the Constitution.

### IV

After giving careful consideration to the motion to dismiss or in the alternative, for summary judgment filed by the Federal defendants, and to so much of the plaintiffs' motion as applies to the Federal defendants, the Court concludes that the plaintiffs' motion should be denied and the Federal defendants' motion should be

granted and the case dismissed as to the Federal defendants.

First, the Federal defendants argue that so much of the plaintiffs' argument as relates to parole consideration has been rendered moot by the consent order in *Garnes*. They note that under *Garnes* it was agreed that District of Columbia Code offenders would be referred to the District of Columbia Department of Corrections for transfer consideration at least nine months prior to their parole eligibility date and that the District of Columbia Parole Board would make the decisions as to parole eligibility.

The Federal defendants also note that the argument suggested by *Cosgrove*, and the argument originally made here that female District of Columbia Code violators are often considered for parole pursuant to the federal guideline rather than the District guideline is based on part on a report by Lucy Steinitz, "The *Garnes* Decree in Reality: Parole Eligibility and Determination for D.C. Women in Federal Correctional Institutions (1981)." Indeed, this report was cited by Judge Bork in his concurring and dissenting opinion in *Cosgrove. See* 225 U.S.App.D.C. at 254, n. 13, 697 F.2d at 1146, n. 13. They noted further that the Steinitz report is dated 1981 and that *subsequent* to that report, the Bureau of Prisons and the District of Columbia Department of Corrections entered into an agreement, hereinafter referred to as the Joint Agreement, establishing the procedure for female District of Columbia Code violators to obtain transfer to the District of Columbia and to have their parole eligibility determined by the District of Columbia Board of Parole. The Joint Agreement was entered into in 1982 and was designed to correct the problems which arose under the *Garnes* decree.

The plaintiffs have not demonstrated that the parties to the Joint Agreement have failed to follow the agreement, although as noted earlier, there was a suggestion in the record that female prisoners are encouraged not to request such transfers. Although the record does not support such a contention, it is of no moment in any event since as noted earlier, the

plaintiffs have now voluntarily dismissed that issue.

As to the *Curry–Bey* issue, it has no great importance here, especially in view of the *Garnes* decree and the 1982 Joint Agreement. The case relates to certain inmate transfers. Under the decisions in *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), a prisoner is not entitled to a fact-finding hearing before transfer from one prison facility to another where the transfer is to a facility where the living conditions may be less comfortable. The Court need not give further consideration to the *Curry–Bey* issue insofar as the Federal defendants are concerned.

▪ With respect to the Federal defendants, the Court concludes that the plaintiffs have failed to state a claim against them. The placement of female District of Columbia Code offenders in Alderson results from the action or lack of action of the District of Columbia, not the federal government or the Bureau of Prisons. It is reasonable to conclude that, just as in the case of male prisoners, if the District of Columbia had constructed a facility for women prisoners in or near the District of Columbia that in most cases, the female prisoners would be placed in that facility. Apparently that was the procedure prior to 1967 when a change was made because the female prison population had dropped to approximately 40 inmates and the local government determined that it was too expensive to maintain a separate facility. As of the filing of this case in 1979, it appears that the number of female prisoners in Alderson was four times that number, approximately 160 inmates.

The only role of the Federal defendants in this case (the Attorney General and the Department of Justice) is to designate the place of confinement for District of Columbia Code offenders, either in the District of Columbia or in a Federal facility. *See* D.C. Code Ann. § 24–425 (1981). Obviously, the Federal defendants cannot designate a facility in the District of Columbia or the local environs where such a facility does not exist. Moreover, this Court can find no requirement that the Federal defendants designate a local facility.

In short, the Court concludes that the motion for summary judgment filed by the Federal defendants should be granted and the case against those defendants dismissed.

V

The final issue before the Court is whether the plaintiffs have stated a claim against the District of Columbia.

The record is quite clear that the District of Columbia has been grappling with this issue since 1966 when the local metropolitan facility for long term female offenders was closed. The District has considered various proposals for the erection of such a facility. Some have argued that such a facility is not cost effective and that the cost of constructing a facility in this area would be much greater than allowing the women to remain at Alderson. Not only is cost a factor, there is also the issue of where such a facility can be placed. Whether it should be within the District of Columbia, or at such locations as Lorton, or the former Children's Center in Maryland. But, these issues do not resolve the issue before the Court.

Since the plaintiffs have agreed, pursuant to their voluntary dismissal of the so-called "parole issues" that parole is no longer in question, the Court must consider whether the remaining issues are sufficient to raise the question to one of constitutional dimensions.

Before addressing those issues, the Court notes that the question of parole consideration raised very serious concerns. Absent the resolution of that question by the parties, serious equal protection issues were raised. Prior to the *Garnes* decree and the Joint Agreement, a female District of Columbia Code violators was treated different than similar violators based solely upon her gender. This resulted from the fact that the United States Parole Commission and the District of Columbia Parole Board followed different guidelines, and it

appeared that in many, if not most cases, the guidelines followed under District of Columbia standards were more lenient than those followed by the federal Parole Commission. Thus, if a female and a male were both convicted of the same crimes, arising out of the same incident, there was a very good chance that the female offender, being considered for parole under the federal guidelines, would serve longer before being released on parole than her male counterpart. This appears to be one of the matters which concerned Judge Bork in *Cosgrove.* As noted, however, this issue is no longer involved in this case.

Turning to the remaining issues now pending, the question is posed whether the fact that female prisoners who are District of Columbia Code violators are placed in a facility located so far from the District violates their rights to equal protection.

First, the plaintiffs contend that visitation rights suffer because of the distance and inconvenience of travel to Alderson. The facility is located approximately 260 miles from the District of Columbia and, as noted, it is not served by scheduled airlines or bus service, and at the time this action was instituted, it was served by Amtrak trains, but the scheduled train service would put a visitor at the prison during the late night or early morning hours. An additional problem in this connection is that the community does not have hotel, motel or even rooming facilities. Plaintiffs contend that this means that female prisoners incarcerated at Alderson have much less of an opportunity to have visits from their families and friends, and perhaps most important, their children.

The Federal defendants [10] argued that under the provisions of the District of Columbia Code, the Attorney General was given authority to designate a facility for prisoners from the District of Columbia. They argue that the designation process relating to District of Columbia Code offenders is no different than in the case of federal offenders and as such, no prisoner

has a legal basis or justifiable expectation that he or she would be incarcerated in the District of Columbia or its metropolitan area.

Plaintiffs next argue that they are unable to participate in programs available to their male counterparts in Lorton, such as "work-training and educational furlough; higher education and institutional work release programs; a variety of necessary social services available in the District of Columbia are, but not at Alderson, West Virginia; and job counseling, referrals and placement services available in the District of Columbia area that are not available in Alderson, West Virginia." They also argue that while the defendants may bring back female District of Columbia Code offenders within six months of their parole eligibility date, their male counterparts incarcerated in the District of Columbia metropolitan area are "eligible for work-training programs two years prior to that."

With respect to transfers, they contend that the women prisoners cannot be transferred to a District of Columbia correctional institution until they are within nine months of their parole eligibility date.

Finally, they note other disadvantages suffered by women placed at Alderson as compared with male placed at Lorton. These are such matters as the fact that the plaintiffs' presence in the area would reduce community re-entry problems and help them to "adjust to changing trends relating to urban living and survival."

### VI

In considering the above arguments, the Court turns to a series of relatively recent cases concerning prisoner transfers both intrastate and interstate, both federal and state.

It is by now clear that a intrastate transfer of an inmate does not directly implicate the Due Process Clause of the Fourteenth Amendment. *Montanye v. Haymes, supra* and *Meachum v. Fano, supra.* Moreover, the Supreme Court has held that an inmate

---

**10.** Although the Court has found that motion for summary judgment filed by the Federal defendants should be granted, some of the arguments made by those defendants are nevertheless helpful in understanding the arguments made for or against the District of Columbia.

**312**

"has no justifiable expectation that he will be incarcerated in any particular prison within a State, [and] he has no justifiable expectation that he will be incarcerated in any particular State." *Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983). The Supreme Court further observed that:

> Often, confinement in the inmate's home State will not be possible. A person convicted of a federal crime in a State without a federal correctional facility usually will serve his sentence in another State. Overcrowding and the need to separate particular prisoners may necessitate interstate transfers. For any number of reasons, a State may lack prison facilities capable of providing appropriate correctional programs for all offenders.

*Id.,* 461 U.S. at 245–46, 103 S.Ct. at 1745–46. The high court went on to state that:

> In short, it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State. Confinement in another State, unlike confinement in a mental institution, is "within the normal limits or range of custody which the conviction has authorized the State to impose." ... Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits. The difference between such a transfer and an intrastate or interstate transfer of shorter distance is a matter of degree, not of kind, and *Meachum* instructs that "the determining factor is the nature of the interest involved rather than its weight." ... The reasoning of *Meachum* and *Montanye* compels the conclusion that an interstate prison transfer, including one from Hawaii to California, does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself.

*Id.* at 247–48, 103 S.Ct. at 1746–47 (citations and footnotes omitted). And, the Supreme Court addressed visitation, work and educational training and transfer arguments similar to those raised here. In doing so, the Court observed:

> The Court in *Montanye* took note that among the hardships that may result from a prison transfer are separation of the inmate from home and family, separation from inmate friends, placement in a new and possibly hostile environment, difficulty in making contact with counsel, and interruption of educational and rehabilitative programs ... These are the same hardships respondent faces as a result of his transfer from Hawaii to California.

*Id.* at 249, n. 9, 103 S.Ct. at 1747, n. 9 (citation omitted).

Thus, the very arguments addressed in this case, save one, have been addressed by the Supreme Court. The difference between this case and the cited cases, however, is that in this case the only reason why the plaintiffs are not within a local or near local facility is that there is no local facility for women. The Supreme Court did not address this issue but did observe at one point:

> As has been shown in the text, however, respondent's transfer was authorized by his conviction. A conviction, whether in Hawaii, Alaska, or one of the contiguous 48 States, empowers the State to confine the inmate in any penal institution in any State unless there is a state law to the contrary *or the reason for confining the inmate in a particular institution is itself constitutionally impermissible.*

*Id.* It is now necessary to turn to the instant case.

Under the above rulings, a very slight change in the facts would seemingly isolate this case from challenge. For example, it seems clear that if all of the facts remained the same except that Lorton was a federal facility operated by the federal Bureau of Prisons, that the plaintiffs would have stated no case. As prisoners they would not have a justifiable expectation that they would be incarcerated in the District of Columbia or the surrounding area. Yet, the same complaints that they assert, namely, lack of visitation rights, distance

and time for travel to Alderson, lack of an urban environment, and being away from a community which might offer work-release or educational programs, would still exist. Here, what seems to distinguish the facts from those just cited is that the District of Columbia prison facility is not quite a federal facility although the Attorney General, a federal officer, does have the authority to assign prisoners to a variety of facilities including Lorton, Alderson, or the other facilities in the federal prison system.

Likewise, if Lorton and Alderson were state institutions in the same state, and one was designated for men and the other for women, it seems unlikely, under the above holding, that an inmate could make a successful challenge as to *placement*, even though her family had just as far to travel and even though placement in a remote part of the state presented certain "hardships." One merely has to consider such states as Alaska, Texas, Montana, California, Nevada to realize that the same problem presented here may exist in other areas and yet not be subject to serious challenge. This is because the Supreme Court has stated that an inmate has no justifiable expectation that he will be incarcerated in any particular prison in a state, or indeed, in any particular state.

The question raised here, however, is whether because of the unique circumstances of the District of Columbia and the fact that the District has failed to provide a facility for women, that that alone is sufficient to raise a fundamental constitutional issue.

Similar challenges have been raised in other cases. For example, in *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich. 1979), women prisoners in Michigan complained that the State had violated their constitutional rights by offering them educational and vocational rehabilitation opportunities "substantially" inferior to that offered male prisoners. The District Court agreed and ordered appropriate relief. The District Judge noted:

> Before analyzing this situation in equal protection terms, it is necessary to select a standard by which the practices of the State can be measured against its goals for the corrections systems generally. *The critical factor in this analysis is gender.* It is clear that the State has provided for the separate incarceration of male and female prisoners, and that Huron Valley is the principal facility devoted to the custody of female prisoners. Thus, a female felon in the State of Michigan will be sent to Huron Valley by reason of her gender alone, and will necessarily have access only to these programs currently available at that location.

*Id.* at 1077–78. The court noted that male prisoners could be sent to a wide variety of prison facilities, while *all* women were sent to Huron Valley, and that the differences in treatment were related directly to gender.

In yet another case, female inmates challenged the programs provided by the Commonwealth of Kentucky at the Kentucky Correctional Institute for Women (KCIW). *Canterino v. Barber*, 564 F.Supp. 711 (W.D.Ky.1983). That court found that the State had violated the rights of the women prisoners in sending them to KCIW where the vocational programs were inferior to those found in institutions for men.

The issue raised here is different. Although these plaintiffs refer to vocational and educational programs, it seems clear that their complaint goes not to the *programs* but rather to the question of *location* or *placement*. Although there are general statements in the record concerning vocational programs and educational programs, the plaintiffs have not really presented evidence on that point. This is because the primary thrust of their attack goes to the issue of placement, or their distance from the District of Columbia. Where there is a showing that vocational or educational programs offered to women are different than those offered to men, and further, that the program offered to women is *inferior* to that offered to the men, then a fundamental constitutional question has been raised. Likewise, a showing that female inmates are considered for parole under guidelines making

it likely that they will be released on parole only after serving a longer period than their male counterparts certainly raises a fundamental constitutional issue.

Furthermore, the segregation of black male prisoners from white male prisoners was found to have violated the Fourteenth Amendment to the Constitution. *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). But there, it is clear that the only basis for the action of state was racial. Here, no one seriously questions that the District would place the plaintiffs in a local facility if one was available.

It is necessary to briefly note how the loss of a facility in the District of Columbia came about. As the record reflects, there was a facility for women until 1966, but at that time the turn of events worked against female inmates, insofar as their placement in or near the District of Columbia is concerned. First, by that time the number of female inmates had dropped to about 40. In addition, the District, because of the *Easter* decision, found that it required a facility for alcoholics. Thus it came to be that the local facility was closed and female felons were eventually placed at Alderson. The decision then, and the decision now appears to be one of economics and available space.

Today, not only does the District lack a facility for women in or near the District, it is hard placed to find room for male prisoners. In recent years it has given early releases to male prisoners simply to make room for new male prisoners, and as a means of bringing itself into compliance with court orders concerning the number of prisoners that can be confined in a given area. And, while the subject of a facility for female inmates is raised periodically, it never seems to go beyond the stage of discussion. This Court, noting that there has been considerable discussion concerning the building of a new prison facility by the District, to augment its existing facilities, posed a question whether the plan included a facility for women. That question was answered in the negative.

## VII

■ Turning then to the instant case the Court concludes that the plaintiffs have failed to demonstrate that the programs provided for them at Alderson are substantially inferior, or even inferior to those programs provided at Lorton. There is no evidence concerning the nature of the programs provided at Lorton, and there is little or no evidence relating the programs provided at Alderson. Not only have the plaintiffs failed to demonstrate that the vocational and/or educational programs at Lorton, or any facility for men in the District of Columbia metropolitan area is superior to those programs provided at Alderson; it may be that the programs at Alderson are far superior to those provided by the local authorities.

Alderson was opened in 1927 and was the first institution for the incarceration of federal female prisoners. Housing is provided in cottages composed of individual rooms and small dormitories and there are specialized units for inmates with drug abuse and medical problems. Moreover, the Bureau provides for adult basic training and high school programs and there is a degree program through a college. The facility apparently offers programs in data entry, business education, cosmetology and drafting and inmates may complete apprenticeships in over 20 programs including such fields as electrical work, dental assistant training and fabric cutting.[11]

A showing that the programs at Alderson are inferior to those in the local facilities for men is a key part of plaintiffs' case. As noted, the plaintiffs have dismissed their parole claims. The parole claim raises a substantial issue, but that is no longer in the case. Looking at what remains in the case, it is obvious that a showing that programs provided for women are inferior to those provided for men, while not dispositive, would assist plaintiffs

---

**11.** The Court has received information relating to various federal prisons in connection with sentencing in criminal cases.

in demonstrating that there is a substantial equal protection question raised. Since such a demonstration is an essential part of plaintiffs' case, there is no requirement that the defendants negate the plaintiffs' claims in that regard. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This being the case, the Court must conclude that insofar as a claim that the programs at Alderson are inferior to programs presented at Lorton is concerned, the plaintiffs have failed to meet their burden. Thus, this case differs from *Canterino v. Barber, supra,* and *Glover v. Johnson, supra,* because in both cases, although the issue focused on the separate facilities for women in Kentucky and Michigan, the thrust of the actions were directed at programs in prison facilities for women that were substantially inferior to those programs provided for men. The decisions rendered in those cases were based upon those discrepancies in programs and not upon the mere physical location or placement of the women or the distance from their homes. The latter is what is really involved in this case.

Thus, insofar as the plaintiffs' motion is based upon inferior programs at Alderson, it must be denied.

■ The above is not dispositive of the plaintiffs' motion. Plaintiffs argue that since there is no facility in the District of Columbia area for female District of Columbia Code offenders, it is necessary to place female offenders in Alderson which is approximately 260 miles from the District of Columbia. Therefore, while male District of Columbia Code offenders are placed at Lorton, within 30 miles of the District of Columbia[12], where there is easier access to them by their families; female offenders suffer because of the great distance between the District of Columbia and Alderson. Moreover, there is no easy route to Alderson and it is not served by convenient regularly scheduled public transportation.

The question of location has been addressed by the Supreme Court in *Olim v.*

*Wakinekona, supra,* and this Court concludes that *Olim* is dispositive of the remaining issues pending before the Court. In *Olim* the Court recognized the great disadvantage to one placed in a prison facility far from his family, friends and home. It also recognized that the separation by such a great distance might lead to difficulty in making contact with counsel and might result in the interruption of educational, and rehabilitative programs. Nevertheless, the Court concluded that, notwithstanding that the transfer from Hawaii to California involved long distances and an ocean crossing, the confinement remained within constitutional limits. The Supreme Court noted that the difference between such a transfer and an intrastate or interstate transfer of shorter distance was nothing more than "a matter of degree, not of kind" and that the "determining factor is the nature of the interest involved rather than its weight." *Olim,* 461 U.S. at 247–48, 103 S.Ct. at 1746–47 (citation and footnotes omitted).

The above case is controlling here. All that is involved is location of the prison facility. While there is no question but that it is inconvenient to the plaintiffs and the members of their families, this Court cannot find that they had a justifiable expectation that they would be incarcerated in a facility in the District of Columbia or its metropolitan area. Indeed, the District of Columbia Code provides that the designation of the place of imprisonment is to be made by the Attorney General or his designee, and under the statute the plaintiffs could have been placed much further away than Alderson. The statute provides that: "The Attorney General may designate *any* available, suitable, and appropriate place, *whether maintained by the District of Columbia government, or otherwise, or whether within or without the District of Columbia.* D.C.Code Ann. § 24–425 (emphasis the Court's). Moreover, under the same statute, the Attorney General is permitted to transfer prisoners from one institution to another for the well being of the

---

12. It appears that some male offenders are also placed at Occoquan, Virginia, which is also located within 30 miles of the District of Columbia.

prisoner or to relieve overcrowding or because of other unhealthful conditions.

Based upon the applicable statutes and the decisions of the Supreme Court, the Court concludes that plaintiffs have failed to demonstrate that the defendants have violated their rights under any statute or the Constitution. As a result the plaintiffs' motion for summary judgment must be denied and the defendants' motions for summary judgment must be granted, and this case will be dismissed.

An appropriate order has been issued.