INMATES OF OCCOQUAN, individually and on behalf of all other persons similarly situated, et al.,

v.

Marion S. BARRY, Mayor, et al., Appellants (Two Cases).

Nos. 87–5055, 87–5295.

United States Court of Appeals, District of Columbia Circuit.

July 8, 1988.

Elizabeth Alexander, Edward I. Koren, Jere Krakoff and Alexa P. Freeman, Washington, D.C., were on appellees' Suggestion for Rehearing en banc.

Before WALD, Chief Judge, and ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

## ON APPELLEES' SUGGESTION FOR REHEARING EN BANC

### ORDER

Appellees' suggestion for rehearing en banc has been circulated to the full Court. The taking of a vote thereon was requested. Thereafter, a majority of the judges of the Court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing it is

ORDERED, by the Court en banc, that the suggestion is denied.

A dissenting opinion by Chief Judge WALD, joined by Circuit Judges SPOTTSWOOD W. ROBINSON, III, MIKVA and HARRY T. EDWARDS, is attached.

A dissenting statement of Circuit Judge RUTH BADER GINSBURG, in which Circuit Judge HARRY T. EDWARDS concurs, is also attached.

A concurring statement by Circuit Judge STARR, in which Circuit Judge SILBERMAN concurs, is also attached.

WALD, Chief Judge, with whom Circuit Judges SPOTTSWOOD W. ROBINSON, III, MIKVA and HARRY T. EDWARDS join, dissenting from denial of suggestion to hear case en banc.

Because I believe this is a case involving "question[s] of exceptional importance," and because the panel opinion is seriously flawed, I would rehear this appeal en banc. See Fed.R.App. P. 35(a). The decision to vacate the district court's order places at risk the health and safety of thousands of prisoners and detainees. Lifting the population lid imposed by the district court on the Occoquan facilities will endanger not only the more than 2,000 inmates presently jammed within its walls, but also the stream of prisoners who will inevitably be transferred to Occoquan from other municipal jails and prisons that still have population caps consented to by the District of Columbia Government. If, as Dostoevsky wrote, "the degree of civilization in a society is revealed by entering its prisons," this record places the District of Columbia in primitive company. Nothing in constitutional law compels us to condone that status.

### I.

The gravest flaw in the panel's analysis is its misapplication of the Supreme Court's test for evaluating the constitutional acceptability of prison conditions. Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), does indeed establish, as the panel recites, a threshold test for Eighth Amendment violations that requires an "unnecessary and wanton infliction of pain," or punishments "grossly disproportionate to the severity of the crime," 452 U.S. at 347, 101 S.Ct. at 2399. However, Rhodes clearly provides that such a standard can be met by showing intolerable living conditions. Rhodes cites approvingly Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (denial of medi-

cal care can be cruel and unusual), and *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (conditions of confinement in two Arkansas prisons were cruel and unusual because they resulted in unquestioned and serious deprivations of basic human needs), and then adds:

> Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we [have] recognized.

452 U.S. at 347, 101 S.Ct. at 2399.

Since *Rhodes,* courts in other circuits have continued to issue remedial decrees, including population caps, where the totality of conditions put the health and safety of prisoners at risk. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982) (imposing population cap in Texas prisons because overcrowding of prison and concomitant shortage of guards posed threat to prisoner safety cognizable under *Rhodes* ); *see also Inmates of Occoquan v. Barry,* 844 F.2d 828, 852–53 & n. 34 (D.C.Cir.1988) (Greene, J., dissenting) (citing other cases); *see also* Gottlieb, *The Legacy of Wolfish and Chapman: Some Thoughts about 'Big Prison' Litigation in the 1980s* in ROBBINS, PRISONERS AND LAW (1987).

The district court here was faithful in following *Rhodes'* test of "unnecessary and wanton infliction of pain" when it carefully assessed the totality of conditions at *Occoquan* and concluded that "this situation, taken cumulatively, presents a clear and present danger to the health and safety of plaintiffs." *See* 650 F.Supp. 619, 631. And the Occoquan conditions *were* atrocious. The District's own special consultant described Occoquan in June 1986 as follows:

> [I]nmates are crowded into dormitories with little or no chance for privacy, causing a great deal of tension with the result that normal prison management difficulties are compounded. In case of fire or serious emergency, it would be next to impossible to evacuate these dormitories effectively. In dormitories J–1 and J–2, which are converted warehouses, the

overcrowding is so serious that it is reasonable to expect some major disturbance in the near future. The noise level in these dormitories exceeded any reasonable limits, and it was necessary to almost shout to be heard. Bunks were so closely packed together that there was only a minimal amount of space between them. There was no ventilation. The door to the outside of the dormitory was open for air, but there was no screen and dust from the outside recreation area and fumes from a nearby stack of coal blew into the dormitory. The dayroom space, or area where the inmates could engage in games and other activities, was extremely limited. Therefore, a large number of inmates were left with no means of activity, and no place to congregate except on their bunks. The cumulative impression is of a very hectic environment that is extremely tense and dangerous.

Appendix ("A.") at 21–22. *See also Inmates of Occoquan,* 650 F.Supp. 619, 620–32 (D.D.C. 1986) (describing, *inter alia,* overcrowding, infestation of kitchens and dormitory rooms, readily transmitted airborne diseases, excessive noise levels, unacceptable sanitation conditions, 40 serious assaults and numerous other reports of violent incidents, grossly deficient fire safety, and systematically inadequate medical and psychiatric care). These conditions parallel in significant respects, the "unspeakable inhumanity" found cruel and unusual by Judge Frank Johnson in the Alabama prison system and liberally described in the panel opinion. *Inmates of Occoquan,* 650 F.Supp. 619, 620–32 (D.D.C. 1986). Just as in the case of the prisons described by Judge Johnson, a correctional official in this case termed Occoquan unfit for human habitation. *Compare Rhodes,* 452 U.S. at 355, 101 S.Ct. at 2404 ("A United States health officer described the prisons as 'wholly unfit for human habitation' according to virtually every criterion used for evaluation by public health inspectors.") *with* A. at 56, 64–65 (corrections official describes dormitory as "a pit," and says, "I really didn't see how people could justify housing people in those

kinds of conditions."). These are conditions which, I respectfully submit, manifestly "deprive inmates of the minimal civilized nature of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. Neither the panel opinion nor the statement our colleagues issue today reaffirming that opinion adequately explains how the sadly squalid conditions at Occoquan comport with the Supreme Court's teaching that the Constitution guarantees prisoners these minimal necessities.

Although the panel opinion, in reversing the district court's finding of unconstitutionality, states that it is closely following *Rhodes*, I believe it misses the central messages of that case. At issue in *Rhodes* was the validity under the Eighth Amendment of the double-celling of inmates in a particular facility. Other prison conditions reflected "generally favorabl[y]" on the institution, which was a modern 3–year–old facility where out-of-cell space was more than adequate, sanitation was satisfactory, violence was not pronounced and tension levels were low. 452 U.S. at 341–43, 101 S.Ct. at 2396–97. The court could find no nexus between the double-celling and other deficiencies, singly or cumulatively, that presented any serious risks to life or limb of the prisoners. 452 U.S. at 348, 101 S.Ct. at 2400. Double-celling by itself was not enough to constitute an Eighth Amendment violation. *Cody v. Hillard*, 830 F.2d 912 (8th Cir.1987) (en banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988), noted by the panel, is a similarly discrete holding. *See id.* at 914 ("there has been no showing ... that elimination of double-celling would alleviate other problems to any perceptible degree"). Nothing in either case would compel the same result here.

At Occoquan—unlike the prisons in *Rhodes* and *Cody*—overcrowding, poor ventilation, substandard medical care, lack of fire protection, and inadequate guard surveillance all combined to produce an environment which the district court found "deprived inmates of the minimal civilized measure of life's necessities." 650 F.Supp. at 632 (quoting *Rhodes*). This inquiry into the totality of prison circumstances at Oc-

coquan fully comports with *Rhodes* which stated that such conditions, "alone *or in combination,*" may create an environment inconsistent with the standards of the Eighth Amendment. 452 U.S. at 347, 101 S.Ct. at 2399 (emphasis added). The panel's analysis, which disavows an inquiry into whether the *aggregate* conditions at Occoquan "deprive[d] inmates of life's necessities," *id.*, and instead examines specific conditions in isolation, *de facto* encodes a constitutional standard at odds with *Rhodes*. For that reason alone, en banc consideration is warranted.

## II.

The panel opinion also errs by interpreting *Rhodes* to "flatly discount expert opinion" in prison cases. Maj. op. at 836; *see also id.* at 839–40. *Rhodes* does not. In fact, *Rhodes* endorsed as legitimate the use of expert opinion—not to *establish* constitutional standards of decency, but to summarize professional knowledge and norms, and to guide the ultimate judicial judgment on what constitutes "elementary decency." *See* 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13.

Since *Rhodes*, courts in other circuits have continued to rely on expert opinion to describe actual prison conditions and to evaluate their impact on prisoners' health and safety. *See* Gottlieb, *supra* at 2–21; *see also* diss. op. at 847.

The district judge in this case, like Judge Johnson in Alabama, properly used expert testimony to evaluate prison conditions. Far from basing its findings of unconstitutionality on Occoquan's failure to follow "good correctional practice" or to satisfy national professional standards, as the panel opinion suggests, the district court cited those expert standards only as "guidelines." Judge Green's judgment of unconstitutionality was firmly rooted in the actual, abhorrent conditions at Occoquan. Unless corrected, the panel opinion will discourage the legitimate use of experts by district courts and counsel and will invite the very evil the majority says it dreads:

judge-specific standards for unconstitutionality.

## III.

I also believe the panel's action in lifting the population cap imposed by the district court is in error. Where, as here, a nexus between overcrowding and the conditions that produce Eighth Amendment violations has been found, no court—before or after *Rhodes*—has denied the validity of population control relief. *See* diss. op. at 852–53 (citing cases from numerous circuits).

Judge Green specifically found that overcrowding at Occoquan was either responsible for, or exacerbated, the prison's inability to provide protection for prisoners vulnerable to serious assault, the unavailability of prompt or effective medical care, the risk of fires and of airborne contagion, and the general unsanitariness of Occoquan facilities. *See, e.g.,* 650 F.Supp. at 634. Those findings are hardly surprising, for overcrowding facilitates contagion and "is the best predicter of assault rates." *See* Geis, *The Effect of Overcrowding in Prisons,* 6 CRIME AND JUSTICE 95 (1985); *see also* McKay, *Prison Overcrowding: The Threat of the 1980's* in ROBBINS, PRISONERS AND THE LAW, at § 6–10 (1987).

The panel opinion, however, deems the population ceiling "much too blunt an instrument" with which to repair these problems, maj. op. at 842. Accordingly, it lays down a standard of minimal intrusion on executive branch autonomy in remedying unconstitutional conditions caused by overcrowding. In so doing, the majority appears to require that the trial judge wait until prison officials have unreasonably delayed or refused to make specific improvements in services, including new buildings, before moving to cap the population. It thus denies district courts the right to go to the heart of the problem by reducing prison population *until* the environment is made safe by other means.

Ironically, the population-cap remedy has been deemed by other courts far *less* intrusive than alternative injunctive steps (*i.e.,* orders to construct new facilities, purchase new equipment or hire additional personnel) because it is readily reversible upon a showing by prison authorities that conditions have improved so as to be consistent with Eighth Amendment norms. *See, e.g., Ruiz.* A population ceiling is indeed a "last resort" remedy insofar as one would hope that prison administrators would provide constitutionally adequate habitation for those whom society incarcerates. When the political process fails, however, a population ceiling can be a convenient and necessary tool for restoring constitutionally adequate conditions until government authorities respond with initiatives of their own design. *See* diss. op. at 852–53 (citing cases).

## IV.

The panel opinion finally warrants review because of its conclusion that the record upon which Judge Green based her findings and relief is now stale and therefore the relief in question was wrongly provided. Yet this argument was not advanced by the District of Columbia in its brief on appeal. If indeed conditions at Occoquan have improved to the point where they are now constitutionally acceptable, the proper course of action for the District of Columbia would be either to request Judge Green to lift her injunction as no longer necessary, or to seek dismissal by this court of the inmates' claim as moot. The city availed itself of neither option.

The panel, accordingly, charted a third, and I believe constitutionally infirm, course. Because the District of Columbia has asserted that it is *trying* to rectify the Occoquan situation, Judge Green's order cannot stand. Yet no undisputed evidence suggests that Occoquan conditions are now constitutionally acceptable, nor is it the burden of appellee-inmates to establish on appeal the ongoing inadequacy of prison conditions. Even assuming that conditions at Occoquan have improved since Judge Green's orders, I frankly cannot understand how these subsequent improvements can be used to impeach the *initial* validity of Judge Green's finding.

Experience has shown there will be no miraculous building of new facilities or improvement of staff ratios overnight at Occoquan. Indeed, the dismal record of the District of Columbia's attempts to build to need or to hire adequate medical staff, effectively shatters any such misconception. *See* diss. op. at 853–55; *see also id.* at 853 (citing cases relating long record of noncompliance with court orders by District of Columbia corrections officials). I do not believe that prisoners must suffer unconstitutional conditions for as long as it takes the political process to improve them. That, however, is the harsh reality of today's judgment; I do not think it is the Constitution's command. The case should be reheard en banc. The victims of this decision are not only the District's prisoners but 25 years of prison litigation aimed at enforcing standards of decency, an evolution now brought to an abrupt halt.

RUTH BADER GINSBURG, Circuit Judge, in which HARRY T. EDWARDS, Circuit Judge, concurs, dissenting from denial of suggestion to hear case en banc:

For the reasons well-stated by District Judge Greene in his opinion dissenting from the panel disposition, I would rehear this case en banc. Judge Greene, in accord with the district judge assigned to this case in the first instance, persuasively maintained that the population ceiling is not "too blunt an instrument" as the record stands at this stage, *see* panel majority at 842; rather, he concluded, it appears necessary and proper, as an interim measure, to defuse at once a situation "both deplorable and explosive," panel dissent at 846, and to impel precise, enduring remedial actions designed and installed by the local correctional administration. *Id.* at 855; *see id.* at 850 & n. 26 (legislative and executive branches, in view of strong pressures against taxing the public to pay for adequate facilities, "will quite naturally opt for incarcerating increasing numbers of persons in whatever

space can be found in existing institutions, even if that should result in conditions which are violative of Eighth Amendment rights").[*] The questions raised, as Chief Judge Wald's statement attests, are vitally important. Those questions, I agree, warrant further review.

STARR, Circuit Judge, concurring in the denial of suggestion for rehearing en banc, with whom SILBERMAN, Circuit Judge, concurs:

In the various opinions spawned by this case, there appears to be, for all the divisions, a fundamental point of agreement: the Supreme Court's decision in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) controls Eighth Amendment analysis. As we stated in the panel opinion, *Rhodes* "was manifestly more than a narrow decision establishing the limited principle that double celling *per se* does not work a violation of the Eighth Amendment." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 835 (D.C.Cir.1988).

We thus agree that "*Rhodes* ... establish[es] ... a threshold test for Eighth Amendment violations that requires an 'unnecessary and wanton infliction of pain,' or punishments 'grossly disproportionate to the severity of the crime,' 452 U.S. at 347 [101 S.Ct. at 2399]." Dissenting Statement of Chief Judge Wald at 796. We also agree that "such a standard can be met by showing intolerable living conditions." *Id.* We further agree that the *Rhodes* Court gave content and specificity to that standard by requiring that such conditions "deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399.

Our division therefore lies not in what the applicable standards are, but in the fidelity of the District Court to those standards. In the dissent's view, "[t]he district court here was faithful in following [the standards set down in] *Rhodes*." Dis. at 797. We respectfully disagree. In our

---

[*] *See also* panel dissent at 853–55 (recounting history of District of Columbia prison litigation and suggesting, to paraphrase Santayana's aphorism, that judges who cannot remember the past, *i.e.*, what has happened in the absence of a

population lid, are condemned to repeat it). I note, in addition, the panel dissent's observation that a population cap is "less intrusive" than "injunctions relating to specific conditions." *Id.* at 856.

view, the District Court's approach evidenced a manifest departure from the Supreme Court's teachings.

Time and again, the District Court relied on testimony from expert witnesses to establish professional standards or criteria against which it measured conditions at Occoquan. Time and again, the court noted "deficiencies" when judged against those norms. But deviations from professional norms do not, in and of themselves, constitute violations of the Eighth Amendment. The lower courts cannot, consistently with the Supreme Court's teaching in *Rhodes,* simply tally up a series of "deficiencies" and find that, in aggregation, they add up to a violation of the Eighth Amendment. We repeat: the conditions must be such that they *deprive inmates of the minimal civilized measure of life's necessities.* As we stated in the panel opinion, "[t]he Eighth Amendment gets at the basic necessities of life; it does not go to the undesirability of conditions to which inmates are subjected." 844 F.2d at 839–40.

And it is in this respect that we discerned error in the District Court's treatment of expert testimony. We have no quarrel with our dissenting colleagues' observation that *Rhodes* "endorsed as legitimate the use of expert opinion," Dis. at 798. The panel opinion in no wise prohibits the District Court from employing expert testimony in its appropriately prescribed role as evidence in prison conditions litigation. But we cannot agree that "[t]he district judge in this case ... properly used expert testimony to evaluate prison conditions." *Id.* In determining whether there has been a violation of the Eighth Amendment, the applicable benchmark is community norms, not the norms of experts in the field of corrections. Indeed, the Supreme Court in *Rhodes* specifically warned that "generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as the 'public attitude toward a given sanction.'" 452 U.S. at 348–49 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). The Court thus reaffirmed its cautionary

observation of two years before that "the recommendations of these various [professional] groups ... simply do not establish the constitutional minima." *Bell v. Wolfish,* 441 U.S. 520, 544 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). But, as we read the District Court's opinion, it is that very error into which the trial court inadvertently fell.

Having determined that the District Court erred in its liability analysis, the question for the panel was whether to conduct that analysis under the proper standard or, alternatively, to remand the case to the District Court for further proceedings. It was, and is, our judgment that the latter, well-trodden path is more consistent with the respective roles of the trial and appellate courts. Our dissenting colleagues' view that in pointing to the stale record, the panel somehow "charted a third ... constitutionally infirm, course," Dis. at 799, represents, with all respect, a misconception of our opinion. Only after having determined that the District Court erred in its liability analysis did we refer to the undisputed staleness of the record as an additional factor in guiding the appropriate manner in which to proceed.

Finally, on the issue of remedies, the real question is whether the traditional requirement in our law that the remedy must be tailored to fit the violation has force. If it does, then it was quite wrong for the District Court to impose a population cap—a last-resort remedy—as a first step. The District Court pointed to specific, cumulative "deficiencies" as violative of the Eighth Amendment, not to overcrowding *per se.* A population cap on the entire institution, trenching as that remedy does on fundamental judgments by the political branches, is scarcely *tailored* to remedy specific deficiencies. Indeed, the very ease of judicial administration in imposing a population cap carries with it the high danger of judicially intruding, in the name of self-restraint, into the most fundamental arenas for decisionmaking reserved in a democratic society to the political branches. Under the circumstances here, a population cap evidences a complete lack of tailoring, as

the District Court's abbreviated analysis in this respect ineluctably suggests.

\* \* \* \* \* \*

Our colleagues'concern with the plight of prisoners in the District of Columbia system is understandable. Our review of the record in the case led us to the view that the conditions at Occoquan, in certain respects, gave us pause. We did not, therefore, dismiss the complaint or otherwise foreclose the challengers' efforts to demonstrate that conditions there ran afoul of constitutional norms. The case lives on. What the panel has done is demand fidelity to the higher law of the Constitution as the Supreme Court has articulated it. Courts are not to be in the business of running prisons or seeking to make them better places. In a democratic society, that function is entrusted to the branches representative of the people. Our more limited role, which is vital to our constitutional democracy, is to divine what the Constitution, as interpreted by the Supreme Court, demands in the difficult and sensitive arena of prison conditions litigation.