**Bettye Delores PITTS, Gwendolyn A. Samuels, et al., Appellants,**

v.

**Richard THORNBURGH, et al.**

**No. 88–5058.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1988.

Decided Jan. 31, 1989.

Jeffrey P. Ayres, with whom John E. Scheuermann, Washington, D.C., was on the brief, for appellants.

Susan S. McDonald, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee District of Columbia.

Mark E. Nagle, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees Richard Thornburgh, et al.

Before STARR and BUCKLEY, Circuit Judges, and JACKSON *, District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is an appeal from a judgment of the United States District Court rejecting an equal protection challenge to certain prison policies of the District of Columbia, 684 F.Supp. 303. The District has for many years relied upon the facilities of the federal Bureau of Prisons for the incarceration of long-term women offenders convicted in the local courts of the District of Columbia. The result is that appellants, and other long-term women offenders, find themselves incarcerated at the Federal Correctional Institution in Alderson, West Virginia, a remote, mountain-bound hamlet situated far from Washington, D.C. Pointing to the District's policy and practice of incarcerating similarly situated males in District-operated prison facilities located near the District of Columbia, appellants complain that the differential treatment of (and accompanying burden on) women offenders runs afoul of the equal protection guarantees of the Constitution.

■ For the reasons that follow, we are persuaded that the challenge falls short. The District's policy, upon close examination, does not embody invidious discrimination reflecting such forbidden factors as outmoded conceptions of the role of women in contemporary society. To the contrary, the District has demonstrated that it has sought to utilize federal resources in order to respond in some measure to the universally recognized blight of the severe overcrowding that afflicts the District of Columbia prison facilities, while pursuing alternatives to alleviate the obvious hardships imposed on long-term women offenders by removing them so far from the comforts and support of family and the resources that would otherwise be available to them in this community.

## I

Plaintiffs are women convicted of violating the District of Columbia Code and sentenced to terms of more than one year. They allege that the correctional policies of the United States government and the District of Columbia government violate the Constitution's guarantee of equal protection. Specifically, they maintain that by incarcerating a class of District of Columbia women offenders (those convicted of

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

non-federal crimes) [1] in Alderson and other federal prisons, while incarcerating most similarly situated male offenders in nearby prison facilities operated by the District government, the government unconstitutionally discriminates against them and other women based upon their gender.

Congress has assigned to the United States Attorney the duty of prosecuting individuals who commit most serious crimes within the District of Columbia. 23 D.C.Code Ann. § 101 (1981). To the Attorney General has gone the duty of assigning those who are convicted and sentenced to a period of incarceration to suitable prison facilities, operated either by the District or by the federal Bureau of Prisons. 24 D.C. Code Ann. at § 425; *see infra* pp. 1457–58. The District controls the operation and construction of local prison facilities, which house most males convicted of non-federal offenses within the District and most D.C. women offenders who fall within one of three categories: those sentenced to one year or less in prison; individuals who are within six months of release; and those who are in pre-trial detention. Brief for (District) Appellees at 7; Excerpted Record Submitted by Appellants 292–94 [hereinafter "R."]. Since 1966, the District has maintained no facilities for women who have been sentenced to more than one year in prison. The federal government maintains four prison facilities for women, namely, Federal Correctional Institutions situated in Alderson, West Virginia; Lexington, Kentucky; Fort Worth, Texas; and Pleasanton, California. Both sides agree that the District's policies cause the Attorney General to assign long-term, D.C. women offenders to prisons located no closer than Alderson while assigning most similarly situated males to the D.C.-operated facilities located in nearby Northern Virginia.

Both sides also agree that the District has undertaken a variety of efforts to provide prison facilities for long-term women offenders. None, however, has yielded success. From 1969 through 1986, the District has at various times (1) investigated conversion of existing facilities for use as a women's correctional facility; (2) negotiated with the State of Maryland to provide local women's prisons; and (3) sought (or planned) to spend funds for the construction of women's facilities. [2] *See infra* pp. 1461–63. During this period, the District's prison system experienced substantial (and continuing) overcrowding. The result has been ongoing litigation, court orders and emergency measures designed to bring the prison system into compliance with constitutionally ordained minimum standards.

Plaintiffs filed suit in federal district court alleging that their gender alone resulted in their being incarcerated far from the District—resulting in the hardship of fewer visitors (especially family members) and less preparation for and support in their eventual return to the District than that afforded males imprisoned at the D.C. facilities. [3] The District Court granted the federal defendants' motion for summary judgment, holding that the differential treatment afforded plaintiffs stemmed entirely from the District's prison policies. *Pitts v. Meese*, 684 F.Supp. 303, 310 (D.D.C. 1987), R. at 588–89. As to plaintiffs' claims against the District, the trial judge concluded that the plaintiffs had made no showing that the vocational and educational pro-

---

**1.** We shall refer to the group of offenders to which appellants belong, and who are as a group located farther from the District than their male counterparts, as "D.C. women offenders" or "women offenders." *Cf.* Brief for Appellants at 3 n. 2 (" 'D.C. women offenders' "); Brief for (District) Appellees at 4 n. 1 (" 'non-federal' or 'District' convicts"). While this group principally includes women convicted of violating the D.C.Code, *see* Brief for Appellants at 3, it more expansively includes women convicted of non-federal crimes. *See* Brief for (District) Appellees at 4 n. 1.

**2.** District officials have expressly recognized that their policies have the effect of treating female offenders differently from male offenders. *See infra* pp. 1459–61.

**3.** Plaintiffs voluntarily dismissed an allegation that women offenders received less favorable parole treatment than men received. *See Pitts,* 684 F.Supp. at 309, R. at 585.

grams at Alderson were inferior to those provided to men at Lorton. *Id.* at 314–15, R. at 599–601. The District Court did recognize that D.C. women offenders were located much farther from the District than men on account of their gender, but held that *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), barred plaintiffs' claim:

> [*Olim* ] is controlling here. All that is involved is location of the prison facility. While there is no question but that it is inconvenient to the plaintiffs and the members of their families, this Court cannot find that they had a justifiable expectation that they would be incarcerated in a facility in the District of Columbia or its metropolitan area.

*Pitts,* 684 F.Supp. at 315, R. at 602. The court held that in the absence of that expectation, no constitutional or statutory claim could rest merely on the difference in location, and it thus granted defendants' motion for summary judgment. *Id.* at 316, R. at 603.

## II

■ It is clear that the government's policies facially classify on the basis of gender: long-term, D.C. women offenders, because they are women, are imprisoned considerably farther from the District than are similarly situated male offenders and consequently suffer a substantial burden.[4] Even so, the District of Columbia argues that because this classification operates in the prison context, we should scrutinize it only to determine whether it is reasonably related to legitimate state interests. Brief for (District) Appellees at 16–17. For the reasons that follow, we decline the District's invitation and conclude that the heightened scrutiny traditionally applied in cases alleging gender discrimination is appropriate.

## A

It is increasingly recognized that issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and that, accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators. In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court emphasized these concerns while articulating the proper standard for review of prison regulations:

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'

*Id.* 107 S.Ct. at 2261 (quoting *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)); *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987) ("By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.").

Any case touching upon prisons necessarily implicates *Turner* 's concerns and requires the court faithfully to attend to them. But, after careful reflection, we believe that neither those concerns, nor *Turner* itself, suggests the appropriateness of a reasonableness standard in this particular case. Here are the reasons why.

*First. Turner* applies to cases involving regulations that govern the day-to-day operation of prisons and that restrict the exercise of prisoners' individual rights within prisons. This case, in stark contrast, chal-

---

**4.** We do not understand the District or federal appellees to contest the existence of this burden. We agree with the trial judge's conclusion that, apart from the lost benefits accompanying proximity to the District of Columbia metropolitan area, the plaintiffs have not established the existence of significant facilities and programs provided male convicts not provided to female convicts. *See Pitts,* 684 F.Supp. at 314, R. at 599.

lenges general budgetary and policy choices made over decades in the give and take of city politics. Equally important, the basic policy decision whether to provide a local women's prison facility does not directly implicate either prison security or control of inmate behavior, nor does it go to the prison environment and regime. In sharp distinction to our case, the Court in *Turner* stressed the discretion to be accorded prison officials in " 'mak[ing] the difficult judgments concerning institutional operations,' " *Turner*, 107 S.Ct. at 2261 (quoting *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539), and warned that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* 107 S.Ct. at 2262. The Court suggested that the proper inquiry should focus on the availability of alternative means for inmates to exercise their individual rights, and on the effects that accommodation of those rights would have in "the necessarily closed environment of the correctional institution." *Id.* The cases that *Turner* drew upon in formulating the reasonableness standard confirm that the case applies most directly to the daily oversight of inmate behavior, with the attendant security concerns and necessary limitations upon "prisoners' rights." *See id.* at 2260–61 (citing *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (ban on contact visits upheld); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (restriction on receiving hardback books upheld); *Jones*, 433 U.S. at 119, 97 S.Ct. at 2535 (restrictions on inmates' union meeting and solicitation upheld); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (ban on direct media interviews with inmates upheld)).

*Second.* In addition to not implicating prison security and day-to-day management concerns, this case touches upon important concerns that the Supreme Court has clearly held call for stepped-up scrutiny. Plaintiffs allege facial gender discrimination, a classification that traditionally summons heightened scrutiny under the Fifth and Fourteenth Amendments. *Cf. Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (*per curiam*) (upholding racial desegregation order applied to prison system). They allege that gender discrimination affects the basic policy decisions of city officials, a context not usually presenting any special bar to judicial scrutiny. Moreover, the Supreme Court has indicated that a facial classification based upon gender, like the one in this case, inherently risks several dangers that the Equal Protection Clause, and the equal protection elements of the Fifth Amendment, are most designed to eradicate. For this reason, Supreme Court decisions interpreting the equal protection guarantees "establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed. 2d 428 (1981) and *Personnel Admin. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)).

An elaboration of these dangers of gender discrimination both emphasizes the need for heightened scrutiny in this case and frames the inquiry for our forthcoming discussion. A classification relying explicitly upon gender peculiarly suggests that the state is pursuing an improper purpose, one that furthers or contains "fixed notions concerning the roles and abilities of males and females," *Mississippi Univ. for Women*, 458 U.S. at 725, 102 S.Ct. at 3336—for example, embodying an objective "to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior." *Id.; see Craig v. Boren*, 429 U.S. 190, 198, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 684, 690, 93 S.Ct. 1764, 1769, 1772, 36 L.Ed.2d 583 (1973). The facial classification especially raises the danger that the state has chosen means that are not sub-

stantially related to a legitimate state interest. The statute may not "employ[ ] gender as an inaccurate proxy for other, more germane bases of classification." *Craig v. Boren,* 429 U.S. at 198, 97 S.Ct. at 457; *see Mississippi Univ. for Women,* 458 U.S. at 726, 102 S.Ct. at 3337. Nor may what the Supreme Court has condemned as "increasingly outdated misconceptions concerning the role of females in the home rather than in the 'marketplace and world of ideas'" underlie the classification based upon gender. *Craig v. Boren,* 429 U.S. at 198–99, 97 S.Ct. at 457–58. A state classification that directs prisoners to distant locations if they are female and locates them nearby if they are male directly implicates these concerns; that sort of classification, the Supreme Court has commanded, demands the court's special attention to ensure that the dangers posed are not dangers in fact.

In the limit they seek to place upon government action, equal protection claims also differ in kind from challenges to limitations upon personal rights that *Turner* subjects to review to ensure that they are "reasonably related to legitimate penological interests." *Turner,* 107 S.Ct. at 2261. While an equal protection claim, too, is in one sense a personal right—*i.e.,* the right not to be discriminated against—the claim is also a demand that governmental action that affects an individual not be predicated upon constitutionally defective reasoning. The claim charges invidiousness, rather than an unwarranted interference with constitutionally secured liberties. This difference is illustrated by the many cases finding that even while the government favors a traditionally protected class with immediate benefits or exemption from an immediate burden, its acts are still subject to heightened scrutiny. *See, e.g., Mississippi Univ. for Women,* 458 U.S. at 718, 102 S.Ct. at 3333 (1982); *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Craig v. Boren,* 429 U.S. at 190, 97 S.Ct. at 453. *Cf. Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (race context).

**B**

In concluding that the court must determine that the classification is substantially related to the achievement of important government objectives, *see Mississippi Univ. for Women,* 458 U.S. at 724, 102 S.Ct. at 3336, we need not (and do not) disregard the special difficulties that arise in the prison context. Indeed, we must not do so. Heightened scrutiny does not eliminate appreciation of both the difficulties confronting prison administrators and the considerable limits of judicial competency, informed by basic principles of separation of powers. *See supra* pp. 1453–54. The court may not slight the task more directly committed to it in a live case or controversy and which is peculiarly within its competence and historic mission: rooting out invidious discrimination condemned by the Constitution. Yet, that inquiry must still acknowledge the importance of the state's interest in the prison context. Similarly, the scrutiny to find a direct and substantial relation between the government's means and ends must not substitute the court's presumed expertise for that of prison administrators as the court evaluates administrators' choices of one course over others. This acknowledgement of the difficulties inherent in the prison context does not reduce or eviscerate heightened scrutiny, but it does recognize that those difficulties do not disappear once a party raises a discrimination claim.

**C**

Our conclusion as to the appropriate analytical framework does have the consequence of disavowing the District Court's reliance upon *Olim.* The trial court drew upon *Olim* 's holding (that prisoners have no expectation of being located in a nearby prison sufficient to constitute a due process liberty interest, *see Olim,* 461 U.S. at 238, 103 S.Ct. at 1742) to conclude that prisoners cannot complain of their incarceration in Alderson rather than at a location closer to the District. *See supra* pp. 1452–53. That women prisoners complained that their gender unconstitutionally determined

their disadvantageous location was not treated in the analysis. This, with all respect, was an error-laden omission; a deprivation of "liberty" protected by the Due Process Clause is not a necessary predicate to a successful claim under the Equal Protection Clause (or, more precisely, the equal protection component of the Due Process Clause). Lesser deprivations routinely underlie equal protection claims. Even a putative but differentially provided benefit can form the basis of an equal protection claim requiring heightened scrutiny. *See supra* p. 1455. *Olim* thus is, upon analysis, not the source of the constitutional principles that must guide us.

### III

Applying the correct standard of review to this case, we are satisfied that neither the District nor the Attorney General through its (or his) policies engaged in unlawful sex discrimination in violation of the Fifth Amendment. For the reasons that we shall now set forth, we readily conclude that an important government interest underlay the correctional policies in question. Additionally, the record before us reasonably permits no conclusion other than that the policies under assault were directly and substantially related to furthering that interest. *Cf. Mississippi Univ. for Women,* 458 U.S. at 724, 102 S.Ct. at 3336.

### A

As it is required to do, *see Kirchberg v. Feenstra,* 450 U.S. at 460 & n. 7, 101 S.Ct. at 1198 n. 7; *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 151, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980), the District has specifically asserted the governmental interest that supports the contested policies —its "interest in minimizing overcrowding in its correctional facilities." Brief for (District) Appellees at 21. Especially in light of the budgetary concerns that the District also cites, *id.* at 20, we are persuaded that the governmental interest in reducing prison overcrowding is, at the least, an important and legitimate interest for purposes of equal protection analysis.

It is no secret that the number of incarcerated D.C. offenders has risen sharply in recent years, *see, e.g.,* R. at 160–61, 443–46; Brief for (District) Appellees at app. 4, placing additional pressures upon an already overburdened prison system. *See, e.g., Twelve John Does v. District of Columbia,* 855 F.2d 874 (D.C.Cir.1988); *Inmates of Occoquan v. Barry,* 844 F.2d 828 (D.C.Cir.), *reh'g en banc denied,* 850 F.2d 796 (D.C.Cir.1988); *Campbell v. McGruder,* 580 F.2d 521 (D.C.Cir.1978). The District's deficiencies in addressing prison overcrowding and the related problems of appalling prison conditions have led to adverse judicial decisions and court orders mandating improvements to overcome constitutional deficiencies. *See, e.g., Twelve John Does,* 855 F.2d at 874 n. 1. *Cf. Twelve John Does,* 861 F.2d 295, 301 (D.C. Cir.1988) ("*Twelve John Does II*") (criticizing "[t]he sorry record of dereliction amassed by the District, its lack of creativity in fashioning ways to reduce overcrowding and its relentless recalcitrance"). The Eighth Amendment's command that "cruel and unusual punishments [shall not be] inflicted" underlies many of these challenges and the resulting court orders. Responding to this constitutional command and orders by seeking to reduce prison overcrowding is surely an important government interest.

### B

But an important governmental interest, standing alone, will not carry the day for those seeking to justify a gender-based classification. The relation between the government's object and its chosen means to achieve its goal also must be considered. *Cf. Mississippi Univ. for Women,* 458 U.S. at 725, 102 S.Ct. at 3336 ("If the State's objective is legitimate and important, we next determine whether the requisite direct, substantial relationship between objective and means is present."). Most of the prominent gender discrimination cases have focused upon the legitimacy or sufficiency of the government's interest. Not so here. In this case, the more substantial issue is whether the District's prison policies are directly and substantially related

to the important government interest in reducing prison overcrowding. On the record before us, we have concluded that they are.

### 1

The special relationship between the District and federal prison systems underlies appellees' claims that the gender classification, which determines where prisoners will serve their sentences, serves to reduce prison overcrowding. The Attorney General must designate the place of incarceration for persons convicted of most non-federal crimes. 24 D.C.Code Ann. § 425. The District, however, has effective control of the construction, management, and operation of the District's prison system, *id.* at § 442; *see Cannon v. United States*, 645 F.2d 1128, 1135–37 (D.C.Cir.1981), and must pay the federal government the cost of confining D.C. prisoners in the federal prison system. 24 D.C.Code Ann. § 424. The Attorney General has designated certain classes of D.C. prisoners for incarceration in the federal prison system: prisoners needing special protection, those presenting other special concerns, and (the class in question here) long-term, women offenders. *See* Brief for (District) Appellees at 9; R. at 40–43. The District of Columbia must provide facilities for other "District" prisoners and indeed, as we recounted earlier, provides facilities for certain groups of women offenders (short-term women offenders, offenders who are within six months of finishing their sentences, and pre-trial detainees). *See supra* p. 1452. However, the District maintains no facilities for long-term women offenders, who are thus sentenced to federal prison facilities located far from the District—a result not befalling long-term male offenders.

The District asserts that, in view of this arrangement between the federal and District prison systems, the District is faced with the choice of (1) continuing its present policy, (2) converting part of its facilities for male prisoners to facilities (or a facility) for women prisoners, or (3) providing new facilities to accommodate women prisoners. The District points to the enormous cost of building new facilities, *see, e.g.,* Brief for (District) Appellees at 7 n. 2, which would divert obviously limited funds from other pressing concerns (such as improving current prison facilities). The District also argues that conversion would increase prison overcrowding because an increased number of prisoners would be forced to occupy the current supply of cells (or, alternatively, the same number of male offenders would occupy a reduced number of cells). *Id.* at 21. This reasoning also applies to the construction of new facilities: The expenditure would allow the District to provide for more prisoners, but because those prisoners would be added to those currently incarcerated in the D.C. system, the expenditures would not necessarily relieve current overcrowding.[5]

As the District concludes, "since the District has no facility for women felons[,] the Attorney General designates 'District' women convicts to serve in federal institutions, thus in effect increasing the total number of spaces for 'District' felons." *Id.* For his part, the Attorney General maintains that "he cannot assign [D.C. women offenders] to facilities that do not exist," Brief for (Federal) Appellees at 5, and that he is without "authority to force the District of Columbia to construct or acquire a facility." *Id.*

In sum, the current policy allows the District, in effect, to create more prison spaces (without spending the funds necessary to provide new facilities) by taking advantage of its special relationship with the federal prison system. As a result of the confluence of the Attorney General's designation policies and the District's allocation of prison resources, the classification that sends women offenders to Alderson (while keeping most male offenders nearby) does serve to reduce prison overcrowding significantly. The following sec-

---

5. This reasoning holds only so long as, as the District suggests, Brief for (District) Appellees at 20, the reimbursement cost remains less than the cost of construction or other provision of additional facilities. The record suggests that this conclusion has proved true in practice. In any event, appellants do not suggest otherwise.

tions consider the directness of the relation between the classification and the government interest in reducing prison overcrowding.

2

Our inquiry into the relation between the classification under challenge and the government interest advanced to justify it begins by noting a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender. The classification at issue obviously responds directly to this common characteristic of correctional institutions, a characteristic found in both the federal and District prison systems. This fact strongly suggests that the location policy does not "employ[] gender as an inaccurate proxy for other, more germane bases of classification," *Craig v. Boren*, 429 U.S. at 198, 97 S.Ct. at 457, which is the central concern of equal protection principles in this context.

Importantly, appellants do not quarrel with the federal prison system's establishment of facilities restricted to a single sex. Nor do appellants attack the gender-based segregation within the few federal facilities that incarcerate both men and women. Similarly, appellants do not challenge the District's policy of segregating its facilities according to gender. Their challenge is much more narrowly focused on the physical location of the gender-separated facilities. We therefore assume for purposes of our analysis that these general, widespread practices in American prison systems do not run afoul of constitutional commands.

Two consequences flow from this general policy. The first is practical. The availability of certain spaces in the federal prison system designated for female offenders will obviously shape which prisoners the Attorney General will designate for incarceration in the federal system. Plainly, the Attorney General will accept only women

offenders at the FCI in Alderson. Similarly, the District's policy choice eliminates the alternative of incarcerating women prisoners in the already overcrowded D.C. facilities currently in service. This leaves the alternatives, as we suggested before, of conversion of a present D.C. facility into a women's prison or the building (or otherwise obtaining) of additional facilities and dedicating those facilities to serve as a women's prison. In other words, the practice of gender-based separation allows the classification according to gender at issue to achieve a modest reduction in prison overcrowding.

The second consequence of gender-based separation is of constitutional dimension. The fact that District prison officials must make decisions within a larger context that includes gender-based separation bears upon and in part justifies the policy itself. In a variety of contexts, the existence of a classification which employs gender is justified when it is constructed with regard for some more pervasive institutional or social differentiation between the sexes.[6] *See, e.g., Rostker v. Goldberg*, 453 U.S. at 57, 101 S.Ct. at 2648; *Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981); *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979); *Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). As the late Justice Stewart characterized the issue, members of different sexes, unlike members of different races, can under certain circumstances be situated differently for constitutional purposes. *Michael M.*, 450 U.S. at 478, 101 S.Ct. at 1209 (Stewart, J., concurring). "[I]n certain narrow circumstances men and women are *not* similarly situated; in these circumstances a gender classification based on clear differences between the sexes is not invidious,

---

**6.** Cases that uphold government classifications based on gender as legitimate, remedial responses to past discrimination also, within this analysis, may be seen as approving of governmental responses to certain differential situations according to gender. *See, e.g., Califano v. Webster*, 430 U.S. at 313, 97 S.Ct. at 1192; *Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974). *Cf. Wygant v. Jackson Board of Educ.*, 476 U.S. 267, 274–76, 106 S.Ct. 1842, 1847–48, 90 L.Ed.2d 260 (1986) (considering types of past discrimination sufficient to justify remedial classification based upon race.)

and a legislative classification realistically based upon those differences is not unconstitutional." *Id.* For example, in *Rostker v. Goldberg* and *Schlesinger v. Ballard,* men were situated differently from women for purposes of combat, and the Court reasoned that Congress could legitimately craft requirements that responded to that difference. *See Rostker v. Goldberg,* 453 U.S. at 57, 101 S.Ct. at 2648; *Schlesinger v. Ballard,* 419 U.S. at 508, 95 S.Ct. at 577. The different situation of men and women buttressed the Court's conclusion that Congress' gender-based policies did not spring from outdated views of women or other impermissible generalizations. *See Rostker v. Goldberg,* 453 U.S. at 78–79, 101 S.Ct. at 2658–59 ("Men and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft. Congress' decision to authorize the registration of only men, therefore, does not violate the Due Process Clause."); *Schlesinger v. Ballard,* 419 U.S. at 508, 95 S.Ct. at 577 ("[T]he differential treatment of men and women naval officers under [statutory provisions] reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service.").

In this case, the classification at issue responds to the unchallenged difference in how the genders are situated in sex-segregated prison systems. *Cf. Dothard v. Rawlinson,* 433 U.S. 321, 336–37, 97 S.Ct. 2720, 2730–31, 53 L.Ed.2d 786 (1977) ("[T]he District Court was in error in ruling that being male is not a bona fide occupational qualification for the job of correctional counselor in a 'contact' position in an Alabama male maximum security penitentiary."). Although the existence of the facial classification raises sufficient concerns to trigger heightened scrutiny, *see supra* pp. 1453–1455, those concerns are relieved to a considerable degree by the response of District officials to the differential situation of the sexes in the federal and local prison systems. The classification at issue does not use gender "as an inaccurate proxy for other, more germane bases of classification," *Craig v. Boren,* 429 U.S. at 198, 97 S.Ct. at 457, but rather directly responds to and entirely correlates with the more pervasive gender classification existing in both federal and state prison systems. *Cf. Dothard v. Rawlinson,* 433 U.S. at 335, 97 S.Ct. at 2730 ("A woman's relative ability to maintain order in a male, maximum security, unclassified penitentiary of the type Alabama now runs could be directly reduced by her womanhood.").

Important though it may be to our analysis, however, this conclusion does not end our long inquiry. Despite the classification's relation to more general differential treatment, we must also ensure that the classification does not otherwise reflect or stem from invidious discrimination. We turn now to that part of the case.

### 3

The policy of locating female offenders significantly farther from the District of Columbia than their male counterparts would, notwithstanding the unchallenged practice of gender-based separation of prison inmate populations, be constitutionally flawed if evidence of record shows it to be the product of traditional stereotyping or archaic notions of "appropriate" gender roles. As the leading Supreme Court cases demonstrate, the government cannot lawfully act in a manner that evinces the belief that women are second-class citizens or unworthy of the consideration provided male offenders—or that some attributes of their gender make them less deserving of the benefits of being incarcerated close to the District. In other words, evidence that invidious discrimination—the ultimate object of heightened scrutiny—produced or underlies the classification at hand would doom the District's prisoner location policy, demonstrating its lack of direct and substantial relation to an important government interest.

As to this, plaintiffs argue principally that the express admissions of District officials establish the invidious character of the challenged classification. Appellants put it this way: "[T]he District of Columbia

candidly has acknowledged that its failures to operate a prison for D.C. women offenders constitutes 'blatant discrimination' against them on the basis of their sex," Brief for Appellants at 7–8, and "has even acknowledged that this failure violates 'the principle of equal protection under the law' with respect to D.C. women offenders." *Id.* at 8 (quoting Statement of Delbert C. Jackson, Director, D.C. Dep't of Corrections 3 (Oct. 1979), R. at 318).

This *mea culpa* sort of evidence would be powerfully persuasive if, as appellants urge, we accepted it at face value. However, the statements featured by appellants repeatedly acknowledge only the obvious: that women offenders, based on gender, bear the burden of being incarcerated at a greater distance from the District than their male counterparts. The D.C. officials label this difference in treatment and concomitant burden as "blatant discrimination." Nowhere, however, do the officials point to how bias, traditional stereotypes, or outdated notions of the role of women underlie that classification and burden. On closer inspection, it will readily be seen that the D.C. officials do not admit or allege that invidious discrimination, in a sense pertinent to equal protection analysis, lurks beneath the District's policies.

This conflation of unequal treatment, on the one hand, and unconstitutional discrimination on the other appears in the very "admissions" upon which appellants most fervently rely. Acknowledgement of the obvious, undisputed reality of unequal treatment of long-term women offenders underlies the highlighted testimony from the deposition of Ms. Taylor, evidence that according to appellants "provides the blueprint for the position ... that the District is discriminating against [appellants] because of their sex." Brief for Appellants at 8.

Q: Is it your testimony today that the District of Columbia Department of Corrections and the District of Columbia government blatantly discriminate against the female offender?

A: Yes.

Q: Upon what do you base that statement?

A: There are still no facilities afforded for female offenders in the District of Columbia equal to those afforded to the male population in that same class group. [*sic*]

Q: What differences are there?

A: The male offenders are housed at the District of Columbia facility at Lorton, located 23 miles from the District of Columbia and within reach of all that the City has to offer that group. The female offenders, the sentenced female offenders, are housed at much further distances and are, by virtue of their removal from this community, unable to participate in those same opportunities afforded the males.

Brief for Appellants at 8–9 (entire quotation from the Deposition of Patricia P. Taylor, Assistant Director, D.C. Dep't of Corrections, R. at 263–64); *see also* R. at 261–62; Testimony of Patricia P. Taylor (Oct. 11, 1979) (before the Subcommittee on Courts, Civil Liberties and the Administration of Justice, Committee on the Judiciary, U.S. House of Representatives), R. at 22 ("Most briefly, the D.C. Department of Corrections and the District of Columbia government blatantly discriminate[ ] against the female offender. We maintain at the Lorton reservation facilities to handle sentenced males. We have no capacity in the Department of Corrections to handle the sentenced female."). Other testimony brought to our attention by appellants reflects only the same acknowledgement of unequally located facilities. *See, e.g., District of Columbia Female Offenders in the Federal Prison System: Oversight Hearings Before the Subcommittee on Judiciary and Education, Committee on the District of Columbia, House of Representatives,* 97th Cong., 2d Sess. 4 (1982), R. at 149 (Statement of David Clarke, Member, City Council of the District of Columbia); *id.* at 10, R. at 155 (Statement of George Holland, Acting Director, D.C. Dep't of Corrections); *id.* (Statement of Bernice Just, Chairperson, D.C. Parole Board); Statement of Delbert C. Jackson, *supra* at 3, R. at 317–18 ("The lack of a Women's Correctional Facility in the District excludes equal protection to the female of-

fender.... Fairness and the principle of equal protection under the law dictate that the District should provide programs and facilities for females comparable to those it provides for men."). Indeed, to the extent that officials making these statements point to the cause of the undisputedly unequal treatment, they confirm that the harsh realities of budgetary constraints and the urgent need to address the intractable problem of severe overcrowding in existing facilities (and the concomitant deterioration in prison conditions) stand squarely in the way of providing nearby facilities for long-term women offenders. *See, e.g., District of Columbia Female Offenders, supra,* at 5, 9, R. at 150, 154; *id.* at 10, R. at 155 ("The solution now being proposed is very costly in terms of dollars. Some will argue that it is also costly in terms of the foregone opportunities to use these bed spaces to alleviate overcrowding elsewhere in our burgeoning system.")

In sum, the various admissions of "discrimination" by D.C. officials stem from the undeniable fact that long-term women offenders, based upon their gender, are incarcerated farther from the District than are otherwise similarly situated male offenders, and, as a result, bear a significant burden. This conclusion, upon reflection, is the unfortunate but legally unexceptional one that the District maintains a classification based upon gender, imposing a burden upon long-term women offenders. Acknowledgement of just that point, the patient reader will recall, formed the starting point of our analysis. *See supra* pp. 1453, 1454 (existence of facial gender classification). Whether officials pin the label of "blatant discrimination" or use some other term to describe the reality of unequal treatment, that disparity, without more, does not establish the existence of a constitutional violation. The court's task is to go beyond labels and rhetoric and determine whether invidious discrimination exists. In that regard, however, nothing in the various admissions by D.C. officials establishes that invidious discrimination exists or that the District's policies do not respond substantially to the important governmental interest in reducing severe prison overcrowding.

### 4

Moving beyond the D.C. officials' testimony, appellants maintain that an additional body of evidence—to the effect that the District has repeatedly tried, unsuccessfully, to establish a prison facility for women close to the District—supports their claims that the District has run afoul of constitutional norms. Brief for Appellants at 11–17. However, this evidence, too, amounts to no more than emphasizing the unfortunate reality of a lack of facilities situated close to the District. Indeed, at oral argument, counsel for appellants forthrightly stated that they were not arguing that the District's efforts constituted a sham. Instead, appellants maintain that the District's efforts had not proven successful and that the District should therefore have tried harder. Rather than establishing invidious discrimination or undermining the substantial relation between the District's end and its chosen means, however, this evidence quite to the contrary portrays a local government struggling to provide local facilities for women and also struggling, within manifest budgetary constraints, to reduce severe overcrowding at its various facilities. That is, this evidence portrays the District responding directly to an important governmental interest. We now turn to the main points of that evidence.

All parties agree that since 1966, when the Lorton facility for women offenders was closed in the wake of a court order, *see Easter v. District of Columbia,* 361 F.2d 50 (D.C.Cir.1966), the District has repeatedly sought to provide local prison facilities to incarcerate long-term women offenders. Over the years, the District has requested funds to construct or expand facilities for use by women, and has proposed to convert (or studied converting) existing facilities. To appellants, those attempts, all of which proved unsuccessful, support their charge of unlawful discrimination. We disagree.

As for one example prominently featured by appellants, the District negotiated with

the State of Maryland in the mid–1970s to establish an arrangement for a women's prison similar to that entered into years ago with the Commonwealth of Virginia (where, of course, the Lorton facilities are located). *See* Brief for Appellants at 11. Those efforts proved fruitless, however, when the Maryland legislature disapproved of the plans. *See* R. at 266. Adverse action in Annapolis can scarcely be laid at the feet of those laboring in the District Building.

In another instance, appellants describe how, at the District's behest, Congress appropriated funds for prison construction in 1977, but that "[t]he District ... never acted upon the appropriation. As a result, those funds eventually reverted back to Congress." Brief for Appellants at 12. However, the record indicates that the District had earmarked a portion of those funds for construction of a women's prison facility and continued that planning when Congress reprogrammed those funds, over the Corrections Department's objection, for other elements of the District's budget. *See* R. at 432–34.

In like manner, appellants dwell on the Fiscal Year 1982 Budget proposal, in which the District initially requested funds in 1980 for conversion of a Youth Center at Lorton to a women's prison but then in 1981 reversed its position. Again, however, the record reflects only that, by virtue of constraints upon available funds, the District changed its position in response to an unanticipated influx of offenders and the resulting overcrowding in existing facilities. *See* R. at 150, 154, 160–61, 345–46. Other examples cited by appellants involve for the most part the District's preliminary examination of alternatives; the record evidence as to why the ventures did not prove successful suggests, again, that the District was responding directly to concerns of prison overcrowding and the real-world constraint of limited funds.

This evidence, we are satisfied, not only does not undermine but is in fact fully consistent with the substantial relation of the District's chosen means to its important interest. The evidence establishes that the means chosen often involved a decision to spend funds or to pursue policies that devoted limited resources to redressing overcrowding in the District's existing facilities —a choice that also frustrated plans to condense the current D.C. prisoner population into fewer cells (conversion of existing facilities) or to allot funds to the construction of new facilities for additional, female prisoners (currently incarcerated at Alderson).

The pattern of failed attempts testifies to the District's understandable perception that long-term women prisoners in one sense (location of imprisonment) bear an unfair burden. But the pattern of the District's failed attempts does not support a legitimate inference that bias, indifference, or outdated stereotypes of women underlay the continuation of the District's differential locating of prisoners according to their gender; indeed, we do not understand appellants to argue as much.[7] Appellants understandably decry their plight of being so far removed from their homes, but they ultimately are forced to argue that the District was bound by the Constitution to overcome the substantial, practical obstacles in its path. This is a rather strained view of what the Constitution commands; in the end, we decline to draw an inference of invidiousness from failed attempts to remedy the situation, an inference that would require us to substitute our conception of optimal prison management for hypothesized District officials' judgment in each of the cases in which their efforts fell short of what appellants desire. Such an extreme and, on this record, unsupported inference of invidiousness would fly in the face of the Supreme Court's admonition, which we have not forgotten in the course of this rather long opinion, that we not allow

every administrative judgment [to be] subject[ed] to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the

---

7. The court may, of course, only draw "legitimate inferences" on behalf of a nonmovant when it reviews a grant of summary judgment.

*See, e.g., McGehee v. CIA,* 697 F.2d 1095, 1098 n. 3 (D.C.Cir.1983) (and cases cited therein).

problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.'

*Turner,* 107 S.Ct. at 2262 (quoting *Procunier v. Martinez,* 416 U.S. 396, 407, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974)); *see supra* pp. 1453–54.

## IV

We come at last to the final phase of our inquiry. On reflection, we are satisfied that this case is now appropriate for final disposition. The reason is, in the main, that appellants repeatedly assert that their challenge is grounded on uncontested facts. *See, e.g.,* Brief for Appellants at 22, 27. Indeed, the trial court rendered its decision after considering cross-motions for summary judgment and after more than eight years from initiation of this suit. Viewing those facts most favorably to appellants, and drawing legitimate inferences in their favor, we nonetheless conclude that they have failed to establish an essential element of the alleged constitutional violation. They have, as we have now explored at some length, established the existence of a facial classification based upon gender that imposes a significant burden upon long-term women offenders. But they have not shown that the District's classification constitutes unconstitutional discrimination as defined by such leading cases as *Craig v. Boren,* 429 U.S. at 190, 97 S.Ct. at 453, and *Mississippi Univ. for Women,* 458 U.S. at 718, 102 S.Ct. at 3333. To the contrary, the classification substantially and directly furthers an important government interest (reducing prison overcrowding within the context of finite resources). The classification emphatically does not employ gender as a proxy for more relevant (and thus legitimate) bases of classification. *See supra* pp. 1458–59. As we have seen, not a shred of evidence suggests that the classification springs from indifference, bias, or archaic notions of women's role in society. *See supra* pp. 1459–62. As appellants themselves emphasize, the District has tried time and again to remedy this unfor-

tunate situation. In sum, having failed to adduce evidence to establish crucial elements of their constitutional claim, appellants cannot now be heard to complain that their claim did not survive summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

We are of the same view with respect to appellants' claim against the federal appellees. Appellants argue that the Attorney General, by virtue of the relationship between the federal and District prison systems, unconstitutionally discriminates by aiding and supporting the District's discrimination. *See* Brief for Appellants at 33–35. For reasons already stated, there has been no showing that the District engaged in unconstitutional discrimination; *a fortiori,* none establishes that the Attorney General supported violations of equal protection guarantees. We therefore need not reach the separate issue whether the Attorney General's relationship to the District was too attenuated to support appellants' claim.

For the foregoing reasons, the judgment appealed from is *Affirmed.*